[Crim. No. 3920. Second Dist., Div. Three. Nov. 19, 1945.]

THE PEOPLE, Respondent, v. DANIEL BRENNAN et al.,
Appellants.

Martin S. Ryan for Appellants.

Robert W. Kenny, Attorney General, and Everett W. Mattoon, Deputy Attorney General, for Respondent.

WOOD, J.—Defendants were accused in an information of the crime of robbery, a felony. Defendant Buras admitted the further charge therein that he had been convicted of two felonies, forgery and possession of narcotics. In a jury trial both defendants were found guilty of robbery in the first degree. Defendants' motion for a new trial was denied.

Defendants contend that the evidence is insufficient to sup-

port the verdict, and that the court erred in receiving certain evidence over the objection of defendants.

On Sunday, October 15, 1944, about 4:45 p. m., two men robbed a grocery market, located at 10811 South Main Street, Los Angeles, of the sum of $350. The cashier testified that on that day, while she was checking the groceries of two customers, two men whom she identified as defendants walked into the checking stand behind her and said, "Be calm and open the till"; that she turned around, and saw Buras' face; that she "looked him squarely in the face," and he was then closer than 2 feet from her; that Buras had a gun against her back, and she opened the till; that she saw Brennan step behind one of the customers, and that was the first time the witness saw him; that Brennan walked to the other side of the till and took the money therefrom; that while Brennan was taking the money from the till she was facing him and observed his face at that time; that they told her "to be quiet and nobody would be hurt," and then they walked out of the market; that they were about 10 feet from her as they walked away, and she then saw the side of Buras' face; that they walked out of the store directly away from her, with their backs toward her; that she watched them as they walked away; that she did not see which direction they went after they left the market; that Buras had a small, dark mustache; that she identified Buras by his "peculiar shaped nose," his complexion, height, and color of his hair; that she identified Brennan by his complexion, his "long slim face, long nose"—"long features"; that both men were wearing dark suits, and Buras wore a tie; and that Buras was bareheaded, and she was not positive whether Brennan was wearing a hat.

Another witness, called on behalf of the People, testified that she had resided 18 years in a store building on the same side of the street on which the market is located; that only a vacant lot about 20 feet wide is between the store building and the market; that the front of the store building is "even with the front of" the market; that the store building (her residence) is about 27 feet wide, and glass windows cover the front of the building; that the window frames have a ledge which is "high" enough off the ground for a person to sit on; that all the windows have venetian blinds; that on the day of the robbery the blinds were slanting toward the sidewalk so that one on the inside could see out, but no

one on the outside could see in; that about 10 a. m. the witness was on the vacant lot between her residence and the market, and she saw the defendants walking south on the sidewalk which extends in front of the two buildings; that she knew most of the people in the neighborhood and her attention was attracted to defendants because they did not "belong" in the neighborhood; that she was in the vacant lot about 1 p. m. of the same day and again saw the defendants pass by, walking south; that she also saw the defendants about 4:40 p. m.; that at said time she was sitting in her living room, and looked up and saw defendants sitting on the window ledge at the front of her residence, and she got up and walked over and stood directly behind them; that she was not a foot away from them; that she then went to the other window and saw their "whole faces" through the blind when they turned around, and she "looked them over good"; that she looked at a clock on the wall and it was 4:40 p. m.; that she could hear them talking and they said "something" about $35; that they sat there about 5 minutes; that she was standing there studying them; that they "got off the window seat and started north"; that they stopped and struck a match on the corner of her residence, and Buras lighted a cigarette for Brennan, and then they walked on and she saw them "turn as they went in the market"; that she then stood in her front door, and saw defendants "coming back" and when they were opposite her front door they started to run; she then stepped out of the door and stood on the sidewalk, and they ran around the corner of the property, then across the street, and down the alley; that Brennan wore a hat; that both defendants wore dark clothing, but Brennan's suit was a lighter shade than that of Buras; and that the witness immediately ran to the market, and there had a conversation with the cashier.

Another witness, called on behalf of the People, testified that she lived on 109th Place, near the market; that "around 4 or 4:30" on the afternoon of the robbery she saw a green automobile which was parked in the alley near her home; that no one was in it when she first saw it, and the motor was running; that she saw two persons walk by the alley, and then she saw them run in the direction of the automobile, but did not see them get in it; and that they drove away.

A police officer testified that about 11 p. m. on October 23rd (8 days after the robbery), he saw a green 1943 Chevrolet sedan parked on Crocker Street; that no one was in the automobile and he and another officer called the robbery squad, and then "staked out" and watched the automobile about 1½ hours until three men entered it; that he and the other officer then rushed to the automobile, and he told them to throw up their hands; that Buras and Brennan raised their hands; that the third man did not raise his hands immediately, but he dropped something on the floor; that the robbery squad arrived at that time; that the witness found a revolver with four cartridges in it on the floor; that neither defendant had a gun on his person at the time of his arrest; that the key to the automobile was in Brennan's coat pocket; and that Buras said the automobile was his, and that he and Brennan had "changed coats."

Defendant Brennan testified that he had known Buras 4 or 5 years; that he (the witness) worked at the Los Angeles Shipbuilding Corporation; that he went to work at 12:30 a. m. on October 15, 1944, and left work at 8 a. m., then went to his home, which was in San Pedro, and went to sleep; that he awakened about 1:30 p. m., and he and his wife then went to a restaurant; that after they ate, they went to the electric railway station and at 2:30 p. m., boarded the train for Los Angeles; that they arrived in Los Angeles at Seventh and San Pedro Streets at 3:50 p. m.; that he knew what time they arrived in Los Angeles, and that is how he determined what time they left San Pedro; that they alighted from the train and went "across the street to a cocktail lounge," known as the Harbor Cafe, where he saw three persons he knew—George Coulter, Howard Hill, Clifford Downard, and the proprietor, a Mr. Schultz; that while he was there he gave Buras' home telephone number to Hill; that after he had consumed 4 or 5 bottles of beer, the witness, his wife and Hill left the Harbor Cafe "just right around 5:00" o'clock and went to the Yankee Club which is about one block west of the Harbor Cafe, where he saw two persons he knew—George Small and Nina Day (also known as Nina Todd); that after he had been at the Yankee Club 35 or 40 minutes, and had drunk 2 bottles of beer, he went alone to a drug store at Third and Spring Streets to have a prescription filled; that he went on a streetcar and returned to the Yankee Club at 6:10 p. m.;

that Buras had arrived during his absence; that after he returned from the drug store the witness drank 2 or 3 small bottles of beer; that Mrs. Day wanted to look for her sister, and about 6:30 the witness, his wife, Buras, Hill and Mrs. Day went in Buras' automobile, a green Chevrolet, to Third and Flower Streets to look for Mrs. Day's sister, and then "just drove around"; that he and his wife had an argument and they took her to the Harbor Cafe about 7:30, and then he, Buras, Hill and Mrs. Day went riding "around"; that they drove out on Central Avenue and purchased a pint of whiskey, and "took a few drinks"; that they went to the Cricket Club at Washington and Vermont to a dance, arriving there about 8:30, and remaining there until midnight; that he was considerably under the influence of liquor when they arrived at the Cricket Club, and while he was there he drank 7 or 8 bottles of beer; that he remembered where they went after they left the Cricket Club—that Buras drove, and they took Mrs. Todd home, and then they went to Seventh and Maple Streets; that he (the witness) was more or less asleep; that he intended to go home but he had "taken too much to drink" and decided to rent a room, but just as Buras drove away the witness was arrested (in the early morning following the robbery) because he did not have his draft registration card; and that he was taken to the city jail, and released the next day.

Buras testified that he was living with his mother and sister on October 15, 1944, at 4058 South Main Street, Los Angeles; that he went to bed late on Saturday, October 14th, and slept until noon on Sunday, the 15th; that he then "stayed around the house" until Hill telephoned about 4 p. m.; that Hill told him Brennan and Mrs. Brennan were with him, and Buras agreed to meet Hill at the Yankee Cafe at 6 p. m.; that he left home about 5:45; and that he arrived at the Yankee Cafe about 6 p. m., at which time Mrs. Day, Mrs. Brennan, Hill and Small were there. His testimony as to the following events that evening was in substance the same as the other witnesses for the defense. He also testified that he never wore a mustache; that on October 15th he wore a brown suit, red shirt and no tie; that the shirt in evidence as exhibit A is the one he wore on October 15th; that he had access to the green Chevrolet sedan and was in possession of it on October 15, 1944; that at the time of his arrest he was wearing Brennan's coat;

that Brennan had the witness' coat on; that they exchanged coats in the Harbor Cafe; and that on July 14, 1942, he was convicted of two felonies—forgery, and possession of narcotics.

Brennan's testimony concerning his whereabouts at the time of the robbery was corroborated by his wife, by the manager, the bartender and two customers of the Harbor Cafe, and by a customer of the Yankee Cafe. Buras' testimony concerning his whereabouts at the time of the robbery was corroborated by his mother and his sister.

The People called a police officer in rebuttal, and he testified that on November 2, 1944, after the preliminary hearing, Brennan said, ''I have got this beat, I was in jail on the day these people say I held them up,'' and that Buras said, ''I don't remember where I was on that day.''

In support of their contention that the evidence was insufficient to support the verdict, appellants argue in effect that the identification of appellants was not sufficient, and that the testimony offered by the defense outweighed that offered by the prosecution. As shown above, two witnesses positively identified appellants as the robbers. Both of them testified they had a full view of the robbers' faces at a time when they were close to and facing them, and one of them testified that she had observed them on three different occasions during the day of the robbery. Although the witnesses were unable to give an exact description of the robbers' clothing, the jury believed that their opportunity for observing the robbers was sufficient to enable them to identify the appellants as the robbers. In denying the motion for a new trial, the trial judge approved the verdict and the necessarily implied finding that the appellants were the persons who committed the robbery. The question of identification was one of fact for the jury. It is not the province of an appellate tribunal to weigh the testimony or pass upon the credibility of witnesses. It is true that appellants produced eight witnesses, six of whom testified that Brennan was in a cocktail cafe at or about the time of the robbery, and two of whom testified that Buras was at his home at the time of the robbery; however, there was a conflict in the evidence and that conflict was resolved against appellants. If the circumstances shown in evidence reasonably justify the verdict, a reviewing court is not warranted in disturbing it. The reason for this rule is stated in the case of *People*

v. *Ohman,* 67 Cal.App.2d 467 [154 P.2d 463], wherein it is said at page 476: "The peculiar advantages which juries and trial judges have of determining whether witnesses are entitled to credence, not upon what they testify to, but by their manner of testifying, has given rise to the familiar rule that reviewing courts will not and cannot set aside verdicts of juries or findings of the trial court based upon evidence on which there appears to exist a substantial conflict." The evidence was sufficient to justify the verdict as to each defendant.

 Appellants further contend that it was error to receive the following testimony (given by the first police officer above mentioned): "I hollered for them to keep their hands in the air. Buras and Brennan raised their hands and Palmer [their companion] didn't—he came to almost being shot, and he dropped something on the floor. I said, 'Put your hands in the air,' and he put them up, and at that instant the robbery squad drove up there"; and "I found a .38 Iver Johnson revolver with four cartridges in it [on the floor of the automobile]." Appellants argue that it was not charged that they were armed with a deadly weapon at the time of their arrest and that said evidence was introduced for the sole purpose of making it appear more probable, since their companion was armed at the time of their arrest, that appellants committed the robbery. Circumstances attending the arrest were admissible. (*People v. Williams,* 14 Cal.2d 532, 538 [95 P.2d 456].) There had been direct testimony that appellants were the robbers, and that Buras was armed with a gun on the day of the robbery. It was not error to receive the above quoted testimony, relating to occurrences at the time appellants were arrested.

The attempted appeal from the verdict is dismissed. The judgment as to each defendant, and order denying defendants' motion for a new trial are, and each is, affirmed.

Desmond, P. J., and Shinn, J. concurred.